## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **GARETH J. HALL, personally,**<br>**and as the Administrator of the**<br>**ESTATE OF CHRISTIAN JOSEPH HALL;**<br>**and FE B. HALL;** | **Civil Action No.:** |
| | |
| **Plaintiffs,** | **District Judge:**<br>**Magistrate Judge:** |
| | |
| **v.** | |
| | |
| **CHARLES S. PHELPS;** | **CIVIL ACTION – LAW** |
| **IAN D. MACMILLAN;** | **JURY TRIAL DEMANDED** |
| **JOHN DOE 1;** | |
| **JOHN DOE 2;** | |
| **ROBERT EVANCHIK;** | |
| **E. DAVID CHRISTINE, JR.;** | |
| **MICHAEL MANCUSO; and** | |
| **MONROE COUNTY, PENNSYLVANIA;** | |
| | |
| **Defendants.** | |

## COMPLAINT

**AND NOW** comes the Plaintiffs, GARETH J. HALL, personally, and as the

Administrator of the ESTATE OF CHRISTIAN JOSEPH HALL; and FE B. HALL;

by and through their counsel, DEVON M. JACOB, ESQUIRE, of the law firm of

JACOB LITIGATION, INC.; and BENJAMIN L. CRUMP, ESQUIRE, of BEN

CRUMP LAW, PLLC, to aver as follows:

1

## JURISDICTION AND VENUE

1.      This action is brought pursuant to 42 U.S.C. §§ 1983, 1985 & 1988.

2.      Jurisdiction is founded upon 28 U.S.C. §§ 1331, 1343, and 1367.

3.      Venue is proper in this Court, as all parties are located within the Middle District of Pennsylvania, and the cause of action arose in the Middle District of Pennsylvania.

## IDENTIFICATION OF
## DECEDENT, PARTIES, AND BENEFICIARIES

4.      The decedent is CHRISTIAN JOSEPH HALL ("CHRISTIAN"), an adult male who on December 30, 2020, was shot and killed at the age of 19. CHRISTIAN was domiciled in Jackson Township, Monroe County, Pennsylvania. CHRISTIAN did not have a spouse or children. CHRISTIAN is survived by his father, GARETH J. HALL, and his mother, FE B. HALL.

5.      Plaintiff, GARETH J. HALL ("GARETH"),[1] is an adult male who during all relevant times was domiciled in Jackson Township, Monroe County, Pennsylvania. GARETH is CHRISTIAN'S father. The Monroe County Court of Common Pleas granted GARETH Letters of Administration for the ESTATE OF CHRISTIAN JOSEPH HALL (ESTATE"). GARETH is a beneficiary of the ESTATE.

---

[1] Due to the decedent, parties, and witnesses, sharing the same last name ("Hall"), to avoid confusion, these persons will be referred to by first name.

6.     Plaintiff, FE B. HALL ("FE"), is an adult female who during all relevant times was domiciled in Jackson Township, Monroe County, Pennsylvania. FE is CHRISTIAN'S mother. FE is a beneficiary of the ESTATE.

7.     Defendant, CHARLES S. PHELPS ("PHELPS"), is an adult male who during all relevant times was employed as a member of the Pennsylvania State Police ("PSP") with the rank of Corporal. All of Defendant PHELPS' actions or inactions were taken under color of state law. He is sued in his individual capacity.

8.     Defendant, IAN D. MACMILLAN ("MACMILLAN"), is an adult male who during all relevant times was employed as a member of the PSP with the rank of Trooper. All of Defendant MACMILLAN'S actions or inactions were taken under color of state law. He is sued in his individual capacity.

9.     Defendant, JOHN DOE 1, is believed to be an adult male who during all relevant times was a member of the PSP as a law enforcement officer. All of Defendant JOHN DOE 1'S actions or inactions were taken under color of state law. He is sued in his individual capacity.

10.     Defendant, JOHN DOE 2, is an adult male who it is believed that during all relevant times was a member of the PSP as a law enforcement officer. All of Defendant JOHN DOE 2'S actions or inactions were taken under color of state law. He is sued in his individual capacity.

3

11.     Defendant, ROBERT EVANCHIK ("EVANCHIK"), is an adult male who during all relevant times was employed as a member and policymaker of the PSP, with the rank Colonel, in the capacity as Commissioner of the agency. All of Defendant EVANCHIK'S actions or inactions were taken under color of state law. He is sued in his individual capacity.

12.     Defendant, E. DAVID CHRISTINE, JR. ("CHRISTINE"), is an adult male who during all relevant times was employed by Monroe County, Pennsylvania, as a policymaker, in the capacity as District Attorney ("DA"). All of Defendant CHRISTINE'S actions or inactions were taken under color of state law. He is sued in his individual capacity.

13.     Defendant, MICHAEL MANCUSO ("MANCUSO"), is an adult male who during all relevant times was employed by Monroe County, Pennsylvania, as a policymaker, in the capacity as First Assistant District Attorney. All of Defendant MANCUSO'S actions or inactions were taken under color of state law. He is sued in his individual capacity.

14.     Defendant, MONROE COUNTY, PENNSYLVANIA ("COUNTY"), owns and operates the Monroe County District Attorney's Office, and employs policymakers CHRISTINE and MANCUSO.

## MATERIAL FACTS

### CHRISTIAN J. HALL Suffers a Medical Emergency:
### PSP Troopers Respond by Shooting and Killing Him

15.    On   December   30,   2020,   CHRISTIAN   JOSEPH   HALL ("CHRISTIAN"), age 19, was standing on the State Route 33 southbound overpass to Interstate 80, in Jackson Township, Monroe County, Pennsylvania, suffering from a mental health emergency.

16.    CHRISTIAN appeared to be contemplating jumping from the overpass to commit suicide.

17.    CHRISTIAN was holding a pellet gun that from a distance looked like a small caliber handgun.

18.    Troopers employed by the Pennsylvania State Police (PSP), including, JOHN DOE 1, JOHN DOE 2, PHELPS, and MACMILLAN, responded.

19.    And after speaking with CHRISTIAN for approximately 1.5 hours, JOHN DOE 2 directed PHELPS and MACMILLIAN to use deadly force against CHRISTIAN if he did not drop the perceived weapon.

20.    Despite the fact that no additional commands were issued to CHRISTIAN, PHELPS and/or MACMILLIAN fired bullets at CHRISTIAN.

21.    At least one of the bullets fired at CHRISTIAN caused him to suffer a fatal injury.

22.     CHRISTIAN was standing in the universal stance of surrender when

PHELPS and MACMILLIAN used deadly force against him.[2]



## **PSP Issues a False Statement**

23.     On the same date, PSP issued the following official statement, on PSP

letterhead, about Christian Hall's homicide:



**STATE POLICE**

**FOR IMMEDIATE RELEASE**

**December 30, 2020**

**Hamilton Township, PA** – On December 30, 2020 at approximately 1:38 P.M., Troopers from
the Pennsylvania State Police at Stroudsburg responded to the state route 33 southbound
overpass to interstate 80 in Hamilton Township, Monroe County PA. for a report of a distraught
and suicidal male standing on the bridge.

Upon arriving on scene, Troopers encountered a male, identified as Christian Joseph Hall, 19
years of age, standing near the bridge and observed Hall to be in possession of a firearm.
Troopers began to speak with Mr. Hall and verbally ordered him to place his firearm on the
ground, to which Hall complied.  As Troopers continued to negotiate with Hall regarding the
incident, Hall became uncooperative and retrieved the firearm and began walking towards the
Troopers.  At which time, Hall pointed the firearm in the Troopers direction.  As a result,
Troopers fired striking Hall.  Hall was secured into police custody and troopers immediately
provided medical assistance until the staged EMS unit arrived.

Hall was transported to Pocono Medical Center in East Stroudsburg, PA where he was
pronounced deceased.

The Monroe County District Attorney's Office and the Pennsylvania State Police will continue to
investigate this incident.

Updates will be provided when they become available.

**MEDIA CONTACTS:**  TFC. David L. Peters, Pennsylvania State Police, Hazleton
                                570-459-3900 ext. 269 or dapeters@pa.gov

                                                # # #

---

[2] The red circle on images 1 and 2 show a bullet impacting the cement wall next to CHRISTIAN while CHRISTIAN'S
hands were in the air a second before he begins to fall to the ground fatally injured. Images 2 and 3 show the distance
between CHRISTIAN and the Individual Defendants who committed the homicide.

24.     PSP's official statement provided, in relevant part, that CHRISTIAN "retrieved the firearm and began walking towards the Troopers. At which time, Hall pointed the firearm in the Troopers' direction. As a result, Troopers fired striking Hall."

25.     Pursuant to FED.R.CIV.P. 11(b)(3), the following factual contentions will likely have evidentiary support after a reasonable opportunity for further investigation or discovery:

a.     The issuance of the statement as drafted was authorized by members of the PSP pursuant to delegated authority by policymakers of the PSP;

b.     The issuance of the statement as drafted was authorized by EVANCHIK;

c.     The issuance of the statement as drafted was authorized by legal counsel for PSP;

d.     Before the statement was authorized to be issued as drafted, the persons who authorized the issuance of the statement as drafted had access to audio and video recordings of the homicide;

e.     The persons who authorized the issuance of the statement as drafted knew that the statement "pointed the firearm in the Troopers' direction" was not factually correct before authorizing its issuance;[3]

---

[3] Said persons would also have known that the "firearm" was ultimately determined to be a pellet gun, and that CHRISTIAN did not point the perceived weapon while *"walking towards the Troopers."*

f.    The persons who authorized the issuance of the factually incorrect statement, despite having the authority and opportunity to do so, did not retract or correct the statement; and

g.    The persons who authorized the issuance of the factually incorrect statement, did so with the intent to thwart public oversight and pressure, undermine the homicide investigation[4] that they knew would likely be conducted by their subordinate employees, and deter FE and GARETH from filing a civil lawsuit.

26.    After PSP issued its official false statement, a bystander video surfaced that appeared to rebut the statement.

27.    To date, neither EVANCHIK nor PSP have retracted or corrected the official false statement regarding the homicide.

28.    Moreover, EVANCHIK has not publicly commented on the homicide or PSP's response to same.

### Attorney General of Pennsylvania:
### Top Law Enforcement Officer in Name Only

29.    The Pennsylvania Attorney General ("PAG") has significantly more resources, experience, and expertise, than the Monroe County District Attorney's Office, to investigate a homicide involving law enforcement.

---

[4] Often referred to as the crime of "obstruction of justice."

30.    In the Commonwealth of Pennsylvania, however, county district attorneys, *and not the attorney general,* have the exclusive jurisdiction to investigate and make prosecutorial decisions regarding any homicide that occurs within their jurisdictions.

31.    The PAG does not have jurisdiction to investigate or prosecute a homicide in the Commonwealth of Pennsylvania unless/until a county district attorney refers the criminal matter to the PAG.

### Monroe County District Attorney Retains Jurisdiction

32.    E. DAVID CHRISTINE, JR. ("CHRISTINE") is the duly elected District Attorney ("DA") for Monroe County, Pennsylvania ("COUNTY"), and as such, is a policymaker for the COUNTY.

33.    In his capacity as DA, CHRISTINE regularly prosecutes criminal cases filed by the law enforcement officers who provide law enforcement services in the COUNTY.

34.    The referenced law enforcement officers would include, but not be limited to, JOHN DOE 1, JOHN DOE 2, PHELPS, MACMILLAN, and law enforcement officers who work closely with same.

35.    Despite knowing that PSP had issued an official false statement that had since been rebutted by a bystander video, CHRISTINE authorized PSP to investigate itself.

9

36.     Moreover, despite the obvious appearance of impropriety, and the significant pressure from FE, GARETH, and the public, to refer the investigation and prosecutorial decision to the PAG, CHRISTINE refused to do so.

37.     CHRISTINE delegated shared policymaking authority to MICHAEL MANCUSO ("MANCUSO"), Monroe County First Assistant District Attorney, to oversee the homicide investigation being conducted by PSP, and to make a final prosecutorial decision.[5]

### FE and GARETH Engage in Protected Speech

38.     FE and GARETH both directly and through their appointed representatives, publicly criticized the members of the PSP who unlawfully shot and killed CHRISTIAN while he was standing in the universal stance of surrender.

39.     FE and GARETH both directly and through their appointed representatives, publicly called for CHRISTINE to refer the matter to the PAG for an unbiased investigation and prosecutorial decision.

40.     FE and GARETH both directly and through their appointed representatives, publicly criticized CHRISTINE for refusing to refer the investigation and related prosecutorial decision to the PAG.

---

[5] CHRISTINE and MANCUSO enjoy *absolute* immunity (instead of *qualified* immunity) solely for their prosecutorial related conduct. Stated another way, as a result of the legislatures of both the Commonwealth of Pennsylvania and United States' failure to act, there is no mechanism under state or federal law in which to hold CHRISTINE and/or MANCUSO civilly liable for their prosecutorial related conduct, even if it is ultimately determined that such conduct resulted from wrongdoing.

41.   FE and GARETH both directly and through their appointed representatives, publicly criticized EVANCHIK and CHRISTINE for refusing to speak with the media and public about the homicide.

42.   FE and GARETH both directly and through their appointed representatives, publicly criticized EVANCHIK and CHRISTINE for failing to initiate conversation with FE and GARETH about the homicide.

43.   FE and GARETH both directly and through their appointed representatives, organized and/or participated in social media campaigns, media interviews, and public vigils, marches, and protests, in multiple cities, states and countries, wherein they made their aforementioned criticisms of CHRISTINE, EVANCHIK, the DA'S Office, and PSP, publicly known.

### The Legislature of Pennsylvania Permits the PSP to Operate Under a Cloak of Secrecy

44.   Pursuant to Pennsylvania's Right to Know Law ("RTKL"), law enforcement mobile video recordings that result in a criminal investigation are not "public records," and thus, are exempt from public access.

45.   Specifically, Section 708(b)(16) of the RTKL excludes from the definition of a public record, "A record of an agency relating to or resulting in a criminal investigation" . . . "(ii) Investigative materials, notes, correspondence, videos and reports."

46.     Therefore, it is reasonable to believe that EVANCHIK, CHRISTINE, and MANCUSO, were of the belief that FE, GARETH, and the general public, would never see the unredacted video.

### CHRISTINE and MANCUSO Retaliate
### Against FE and GARETH for Engaging in Protected Speech

47.     Deviating from national standard practice and common decency, EVANCHIK did not reach out to FE and GARETH to extend PSP'S condolences, answer questions they may have had, offer to permit them to view the unredacted MVR video, or explain the homicide and internal affairs investigation process.

48.     Similarly, deviating from national standard practice and common decency, CHRISTINE and MANCUSO did not reach out to FE and GARETH to extend their condolences, answer questions they may have had, offer to permit them to view the unredacted MVR video, explain the criminal investigative process, explain how the prosecutorial decision would be made, or discuss their investigative findings and related prosecutorial decision.

49.     Instead, CHRISTINE and MANCUSO released a statement to the public and media scheduling a press conference.

50.     The conducting of a press conference is not part of CHRISTINE and MANCUSO'S prosecutorial duties.

51.    Upon hearing from the media about the scheduling of a press conference, counsel for FE and GARETH formally requested, in writing, a private meeting for the family to take place before the press conference.

52.    The written request, despite having been received, did not receive the courtesy of a response.

53.    On March 30, 2021, MANCUSO conducted a press conference to announce CHRISTINE and his investigative findings and prosecutorial decision.

54.    At the start of the press conference, MANCUSO publicly admonished and embarrassed FE and GARETH for their public protests, falsely accused them of refusing to cooperate with the criminal investigation, negatively commented about their request to have the matter referred to the PAG, implied that they should not blame themselves for CHRISTIAN'S death, and attacked CHRISTIAN'S character.[6]

55.    Retaliating against persons for exercising their First Amendment right to criticize the government is not part of CHRISTINE and MANCUSO'S prosecutorial duties.

56.    The use of force inquiry considers the "totality of the circumstances" without the benefit of hindsight.

---

[6] CHRISTINE, MANCUSO, and COUNTY, understood that the retaliatory conduct violated FE and GARETH'S First Amendment Rights; as evidenced by the redaction of the commentary from the released copy of the press conference.

57.     The totality of the circumstances, however, only includes information *known to the Troopers at the time when they used the force*.

58.     MANCUSO did not discuss PSP policy or training, and whether the involved Troopers acted in accordance with same.

59.     Instead, MANCUSO presented information purportedly discovered by investigators *after* the shooting and clearly not relevant to the use of force inquiry – CHRISTIAN'S confidential juvenile record, and unsubstantiated allegations of unrelated criminal wrongdoing.

60.     Notably, the most relevant and material piece of evidence related to the question of whether or not the deadly force used was objectively reasonable – a video and audio recording of the actual use of force – was redacted and pixelated so that the public could not review and evaluate same.

61.     Pursuant to FED.R.CIV.P. 11(b)(3), the following factual contentions will likely have evidentiary support after a reasonable opportunity for further investigation or discovery:

  a.     MANCUSO engaged in this conduct in retaliation for FE and GARETH exercising their First Amendment right to criticize the government.

  b.     CHRISTINE permitted MANCUSO to engage in this conduct in retaliation for FE and GARETH exercising their First Amendment right to criticize the government.

14

62.     As a result of CHRISTINE and MANCUSO'S retaliatory conduct, FE and GARETH are now fearful each time they engage in further protected speech and have tempered their public protected speech.

### CHRISTINE and MANCUSO Mislead the Public

63.     During his press conference, MANCUSO played a PowerPoint presentation that contained excerpts from the MVR video of the incident.

64.     The publication of excerpts from the MVR video was an exception to the cloak of secrecy under which the RTKL permits PSP to operate.

65.     Starting at around 19:47 minutes, the PowerPoint provides, "Mr. Hall took yet another step in the direction of the involved officers as he manipulated his weapon in the previously mentioned fashion."

66.     What occurs immediately thereafter, i.e., the fatal shooting, is then redacted (pixilated) in the PowerPoint presentation.

67.     The PowerPoint presentation misleads the viewer into believing that in the redacted portion of the video, CHRISTIAN pointed the perceived handgun at Troopers while advancing on Troopers.

68.     Pursuant to FED.R.CIV.P. 11(b)(3), the following factual contentions will likely have evidentiary support after a reasonable opportunity for further investigation or discovery:

a.     CHRISTINE and MANCUSO approved the PowerPoint presentation;

b.     CHRISTINE and MANCUSO intended for the PowerPoint presentation to mislead the viewer into believing that in the pixelated portion of the video, CHRISTIAN pointed the perceived handgun at Troopers and advanced on Troopers.

c.     CHRISTINE and MANCUSO intended for the PowerPoint presentation to support the PSP'S factually incorrect statement;

d.     The PowerPoint presentation was intended to thwart public oversight;

e.     The PowerPoint presentation was intended to mislead FE and GARETH in an attempt to protect the PSP Defendants from civil liability.

69.     Unlike in most jurisdictions nationally, EVANCHIK, as head of the PSP, has never met with the family of the decedent or taken to the podium to answer the media's questions related to the homicide and subsequent investigation of same.

70.     Likewise, unlike in most jurisdictions nationally, CHRISTINE, as head of the DA'S office, has never met with the family of the decedent or taken to the podium to answer the media's questions related to the homicide and subsequent investigation of same.

16

**EVANCHIK and PSP Misuse the Criminal
History Record Information Act to Thwart Public Oversight**

71.     In April of 2021, Gareth J. Hall, personally, and as the Administrator

of the Estate of Christian Joseph Hall, filed a Praecipe for Writ of Summons in the

Court of Common Pleas, 43rd Judicial District Monroe County, Pennsylvania, and

issued a subpoena to EVANCHIK as the custodian of records for the PSP, to produce

all audio, video, and documents, related to CHRISTIAN'S homicide.

72.     Initially, EVANCHIK refused to produce *any* documents asserting that

all documents were protected from discovery pursuant to Pennsylvania's Criminal

History Record Information Act ("CHRIA").[7]

73.     However, MVR video created contemporaneously with the occurrence

of an incident that does not contain investigative or treatment information (while not

subject to disclosure pursuant to the RTKL), is *not* protected from discovery during

litigation pursuant to CHRIA.

---

[7] Chapter 91 of the Crimes Code of Pennsylvania and Pennsylvania Consolidated Statutes Annotated, 18 Pa. C.S.A. 9101 et. seq., the Criminal History Record Information Act ("Act"), applies to any person or agency of the Commonwealth, or its political subdivisions, which collects, maintains, disseminates or receives criminal history record information. The purpose of the Act is to provide for an orderly collection and dissemination of criminal history information in the Commonwealth. The Act sets forth procedures for reporting arrest, fingerprinting, final disposition and expungement. Also included in the Act are guidelines for the collection and dissemination of intelligence, investigation and treatment information known as "protected information."

74.     Despite what Pennsylvania law provides, however, it is EVANCHIK'S policy and practice to assert CHRIA as a reason to refuse to comply with a valid subpoena requiring production of such video.[8]

75.     When EVANCHIK'S frivolous CHRIA objection was challenged, EVANCHIK agreed to produce the videos but only subject to a confidentiality agreement. See Email String **(Exhibit 1)**.

76.     Stated another way, EVANCHIK would only agree to produce what he was required to produce if FE and GARETH would agree not to exercise their First Amendment rights.

77.     It took a threat to file a motion to enforce the subpoena and for sanctions before EVANCHIK produced the unredacted MVR video without a confidentiality agreement.

78.     The unredacted MVR video revealed a harrowing truth.

### The Truth is Discovered:
### <u>CHRISTIAN Was Shot and Killed While Surrendering</u>

79.     Members of PSP on scene, including JOHN DOE 1, JOHN DOE 2, PHELPS, and MACMILLAN, knew or believed the following:

---

[8] This is not an isolated issue. In a legal action resulting from PSP'S response to a request for emails, text messages, and voicemails, made pursuant to Pennsylvania's Right-to-Know Law, Commonwealth Court Judge Ellen Ceisler was recently quoted as stating that "it is still glaring to see every piece of information blacked out," while noting that there was no clear explanation for the redactions. Notably, when the requestor initially filed a petition with the Pennsylvania Office of Open Records to challenge PSP's response to the request, PSP produced less redacted copies of the emails. <u>Judge admonishes Pa. State Police for response to request seeking email, phone records · Spotlight PA</u>

a.    CHRISTIAN was emotionally distraught and threatening suicide;

b.    CHRISTIAN was not thinking rationally;

c.    CHRISTIAN was smoking marijuana and visually impaired;

d.    CHRISTIAN'S hand/eye coordination was compromised as evidenced by his stumbling and slow uncoordinated steps;

e.    CHRISTIAN'S responses to statements and questions appeared to be slow;

f.    CHRISTIAN possessed what appeared to be a small caliber handgun;

g.    Due to the wind and distance, it was difficult to hear CHRISTIAN; and

h.    No exigent circumstance existed requiring the incident to be rushed to a conclusion.

80.    Members of PSP on scene, including JOHN DOE 1, JOHN DOE 2, PHELPS, and MACMILLAN, knew that CHRISTIAN did not present as a significant threat to anyone other than himself for the following reasons:

a.    CHRISTIAN was approximately 70 feet away from the closest Trooper;

   b. Members of PSP wore ballistic vests that small caliber bullets could not penetrate;

   c. Members of PSP had ballistic shields that small caliber bullets could not penetrate;

   d. Every member of PSP had semiautomatic handguns and were professionally trained to use same;

   e. At least one member of PSP had a rifle and was professionally trained to use same;

   f. Members of PSP had cover in the form of several police vehicles;

   g. All vehicle traffic was stopped and the public held at a safe distance;

   h. CHRISTIAN never pointed a weapon at anyone;

   i. CHRISTIAN never threatened to harm anyone; and

   j. A small caliber handgun is not accurate at 70 feet.

81. Pursuant to FED.R.CIV.P. 11(b)(3), the following factual contentions will likely have evidentiary support after a reasonable opportunity for further investigation or discovery:

   a. Before forcing the incident to conclusion and using deadly force against CHRISTIAN, despite the opportunity to do so, the PSP never attempted to contact FE or GARETH to request their assistance;

b.      Unlike the local police department, the PSP refuses to work with available local mental health professionals;

c.      No mental health professional was summoned to the scene; and

d.      Less-lethal equipment such as bean bags were available but not brought to the scene and/or used.

82.    Members of PSP on scene, including JOHN DOE 1, JOHN DOE 2, PHELPS, and MACMILLAN, did not instruct CHRISTIAN not to move.

83.    To the contrary, members of PSP on scene, including JOHN DOE 1, JOHN DOE 2, PHELPS, and MACMILLAN, repeatedly told CHRISTIAN to both put down the gun and to walk towards them.

84.    CHRISTIAN slowly walked towards the Troopers as instructed.

85.    It is reasonable to assume that CHRISTIAN walked towards the Troopers as instructed because the Troopers had gained his trust, the Troopers told him they would not shoot him, Troopers told him that he needed to get off of the bridge, and he was cold, scared, and wanted help.

86.    PSP policy does not permit Troopers to fire warning shots.[9]

---

[9] PSP Police Provides: "Warning Shots: Members and enforcement officers who are trained and authorized to carry firearms are prohibited from firing warning shots under any circumstances. Warning shots are usually not aimed at a specific target and may create a danger to others. Additionally, other members or enforcement officers and/or other peace officers may mistake the intention and subsequently shoot without appropriate justification."

87.     Despite the fact that CHRISTIAN did not present as a credible serious threat, JOHN DOE 1 fired several bullets at him in an attempt to seriously injure or kill him.

88.     The bullets missed CHRISTIAN, the intended target.

89.     The unredacted MVR video establishes that in the final moments leading up to the unlawful homicide, CHRISTIAN deescalated the situation while JOHN DOE 1, JOHN DOE 2, PHELPS, and MACMILLAN inexplicably escalated the situation.

90.     JOHN DOE 1, JOHN DOE 2, PHELPS, and MACMILLAN'S escalation of the incident deviates from national standard practice.[10]

91.     Specifically, upon hearing the shots, CHRISTIAN stopped walking, put his arms out and then up, pointed the perceived handgun up to the sky, and froze.

92.     At that moment, CHRISTIAN was standing in what is widely regarded as the universal sign of surrender.

93.     Despite this fact, JOHN DOE 2 issued an order that "If he doesn't drop it, take him."[11]

---

[10] See, e.g., 4 Principles of Law Enforcement De-Escalation - Lexipol

[11] PSP Policy Provides: "Protection: Members and enforcement officers who are trained and authorized to carry firearms may use deadly force to protect themselves or another from what they reasonably believe to be an imminent danger of death or serious bodily injury."

94.     Immediately thereafter, and despite the fact that any perceived threat had *deescalated*, PHELPS and MACMILLAN fired bullets at CHRISTIAN with the intent of causing him to suffer serious injury or death.

95.     Unbelievably, CHRISTIAN kept his hands in the air even while bullets were impacting his body.

96.     The bullets fired by PHELPS caused CHRISTIAN to suffer serious and fatal injuries.

97.     In the alternative, the bullets fired by MACMILLAN caused CHRISTIAN to suffer serious and fatal injuries.

98.     In the further alternative, the bullets fired by PHELPS and MACMILLAN caused CHRISTIAN to suffer serious and fatal injuries.

99.     Notably, between the issuance JOHN DOE 2'S order and the first bullet fired thereafter, no orders were given to CHRISTIAN.

100.    The unredacted video is undisputed evidence establishing that PSP's official written statement was false and the DA's PowerPoint was intended to mislead the public; both intending to coverup the unlawfulness of the homicide.



**<span style="color:red">Warning: Graphic Video</span>**
**Click Above Image to Play Video**

### Autopsy

101.    An autopsy was performed on CHRISTIAN, which determined that the caused of death was multiple gunshot wounds and that the manner of death was homicide.

102.    It was determined that as a result of PHELPS and/or MACMILLAN'S use of force, CHRISTIAN suffered the following injuries:

a.    Gunshot wound to the head: the bullet entered the right frontal-pariental scalp, and caused injury to the skin, soft tissue, skull, dura matter, and brain.

b.    Gunshot wound to the right side of back/right axilla; and

c. Gunshot wound to the torso: The bullet entered the left inguinal region

causing injury to the skin, soft tissue, muscles of the pelvis, internal iliac artery and

branches, and sacrum.

### EVANCHIK and PSP Negotiated a Collective Bargaining Agreement that Permits a Significant Delay in Completing an Internal Affairs Investigation in an Attempt to Avoid Civil and/or Criminal Liability

103.   EVANCHIK and PSP negotiated at arm's length, a collective

bargaining agreement that permits PSP to significantly delay investigating and

deciding whether a use of deadly force violates PSP's policies and training.

104.   Doing so permits EVANCHIK and PSP to delay making this

determination until after a criminal and often a civil case is completed.

105.   Whether law enforcement acted pursuant to, or in violation of, polices

and training, however, is directly relevant to the qualified immunity issue.[12]

---

[12] See e.g., Charles v. Johnson, No. 20-12393, 2021 WL 5313668, at *10 (11th Cir. Nov. 16, 2021) ("Once we determined that the use of force was excessive, the next question in the qualified immunity analysis asks whether the officer violated clearly established law. A police handbook that directs an officer to avoid a particular unconstitutional activity can be evidence that the officer was so warned."); Mercado v. City of Orlando, 407 F.3d 1152 (11th Cir. 2005); New v. Denver, 787 F.3d 895, 901 (8th Cir. 2015) (officer entitled to qualified immunity because "an objectively reasonable police officer with [defendant's] training and experience could have reasonably believed that [he had] probable cause to arrest"); Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008) (affirming denial of qualified immunity where officers' conduct inconsistent with their "training and existing case law at the time"); Weigel v. Broad, 544 F.3d 1143, 1155 (10th Cir.2008) ("[T]he reasonableness of an officer's actions must be assessed in light of the officer's training."); Estate of Booker v. Gomez, 745 F.3d 405 (10th Cir. 2014); Drummond ex rel. Drummond v. City of Anaheim, 343 F.3d 1052, 1062 (9th Cir. 2003) (police department training materials are relevant for purposes of qualified immunity when assessing "whether reasonable officers would have been on notice that the force employed was objectively unreasonable."); Gottlieb v. Cty. of Orange, 871 F.Supp. 625, 629 (S.D.N.Y. 1994) (entitled to qualified immunity "[g]iven the procedures and training they were given, it was objectively reasonable for the[m] . . . to believe that their acts . . .

**EVANCHIK Refused to Confirm the Personal
Involvement of the Shooters Undermining Their Ability to be Sued**

106.   The personal involvement of each named Defendant is a necessary element that must be pled when asserting a claim pursuant to 42 U.S.C. § 1983.[13]

107.   Only after litigation was initiated did EVANCHIK eventually identify the shooters as CHARLES S. PHELPS ("PHELPS") and IAN D. MACMILLAN ("MACMILLAN"). See Email Disclosure **(Exhibit 2)**.

108.   While it is believed that PHELPS fired the fatal shots, EVANCHIK refused to confirm this fact unless FE and GARETH were willing to enter into a confidentiality agreement.

109.   EVANCHIK'S insistence on a confidentiality agreement before identifying the proper parties and their respective personal involvement undermined FE and GARTH'S ability to file a private criminal complaint and to fully state their civil claims.

---

did not violate the plaintiffs' constitutional rights"), aff'd, 84 F.3d 511 (2d Cir. 1996); Bowyer v. Houck, No. 5:05-CV-00628, 2006 WL 6854908, at *2 (S.D.W. Va. Nov. 14, 2006) (in qualified immunity inquiry, "[c]learly, an objectively reasonable officer would consider his training when making a split-second decision to use [force]"); Carrero v. Farrelly, 310 F.Supp.3d 581 (D. Md. 2018) ("Officer Farrelly's training, or lack thereof, is highly relevant to what he 'knew or reasonably should have known . . . under the circumstances, and therefore whether he is entitled to qualified immunity.") (quoting Harlow, 457 U.S. at 815); Jackson v. Tellado, 236 F.Supp.3d 636 (E.D. N.Y. 2017) (taking an officer's training into account in the qualified immunity analysis).

[13] See Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988); Garvin v. City of Phila., 354 F.3d 215, 220 (3d Cir. 2003).

**EVANCHIK Permits and Encourages a Longstanding Culture
Where Killing Troubled Persons When Not Necessary is Tolerated**

110.   In 2008, PSP Trooper Jay Splain was named Trooper of the year by his unit after he shot and killed a suicidal man who allegedly pointed an Uzi submachine gun at him.

111.   Trooper Splain would go on to shoot and kill three additional people during separate incidents.

112.   All of the victims were troubled persons, and in two of the incidents, family had called police to help with suicidal individuals.

113.   It would not be until 2021 that Trooper Splain's full conduct would become a matter of public knowledge because PSP used state law to withhold information from family and the public, and actively litigated against disclosure.

114.   In all of the homicides, PSP insisted and was permitted to investigate itself.

115.   While the latest homicide is still being investigated, prosecutors used Pennsylvania's secret investigative grand jury system to clear Trooper Splain of wrongdoing.

116.   Notably, like in the instant matter, in its review of Trooper Splain's killings, The New York Times found inconsistencies between what the evidence showed, and what PSP said happened.

See [After 4 Killings, 'Officer of the Year' Is Still on the Job - The New York Times (nytimes.com)](nytimes.com)

117.   For example, in the Uzi homicide, Splain's commanding officer reportedly stated that the decedent "ignored repeated orders from Trooper Splain to stop and drop the firearm" and "lowered the gun forward."

118.   The New York Times, however, discovered that PSP failed to mention or account for the fact that the decedent had used electrical tape to strap the Uzi to his neck and chest, so the barrel pointed up at his chin.

### EVANCHICK and PSP Reject the Recommendation of
### The Pennsylvania State Law Enforcement Citizen Advisory Commission

119.   In December of 2021, The Pennsylvania State Law Enforcement Citizen Advisory Commission issued the following recommendation:

> The Pennsylvania State Law Enforcement Citizen Advisory Commission recommends that the Pennsylvania State Police require all criminal investigations of use of force incidents resulting in death or serious bodily injury, member-involved shootings resulting in death or serious bodily injury, and in-custody deaths involving its members be referred for investigation to an external agency that meets minimum accreditation standards for handling such investigations as recognized and recommended by the United States Department of Justice as best practices and as similarly mandated in other jurisdictions.

[Critical incident report - Final Report of the Commission for 21-0011-P (Critical Incident) with RESPONSE BY COVERED AGENCY - DocumentCloud](https://www.documentcloud.org)

120.   In rejecting the recommendation, EVANCHICK is reported to have stated that "every officer involved shooting or other serious police incident involving a member is thoroughly investigated, both criminally and administratively[.]"

See Pennsylvania State Police push back on panel recommendation requiring independent investigations when troopers kill, injure · Spotlight PA

### COUNT I

**Plaintiff GARETH v. Defendants JOHN DOE 1,
JOHN DOE 2, PHELPS, and MACMILLAN
Fourth Amendment (Excessive Force)
Pursuant to 42 U.S.C. § 1983**

121.   Paragraphs 1-120 are incorporated herein by reference.

122.   Claims that law enforcement officers used excessive force are analyzed under the Fourth Amendment's objective reasonableness standard. See Graham v. Connor, 490 U.S. 386, 388 (1989).

123.   To state a claim for excessive force under the Fourth Amendment, a Plaintiff must show that a seizure occurred and that it was objectively unreasonable. See Curley v. Klem, 499 F.3d 199, 203 (3d Cir. 2007).

124.   The test of Fourth Amendment reasonableness of force used during a seizure is whether, under the totality of the circumstances, a law enforcement officer's actions are objectively reasonable in light of facts and circumstances confronting him, without regard to his underlying intent or motivations. See Kopec v. Tate, 361 F.3d 772, 776 (3d Cir. 2004); Graham, 490 U.S. at 397.

125.   JOHN DOE 1 used physical force against CHRISTIAN, by firing bullets at him with the intent of causing serious injury or death.

126.   JOHN DOE 2 issued an order for CHRISTIAN to be shot by bullets

simply if he did not "drop" what was believed to be a small caliber handgun.

127.   PHELPS used physical force against CHRISTIAN, by firing bullets at him with the intent of causing serious injury or death.

128.   MACMILLAN used physical force against CHRISTIAN, by firing bullets at him with the intent of causing serious injury or death.

129.   When JOHN DOE 1 used deadly force against CHRISTIAN, CHRISTIAN did not present as a credible threat of causing serious injury or death to anyone.

130.   When JOHN DOE 2 ordered the use of deadly force, and PHELPS and MACMILLAN shot bullets at CHRISTIAN, CHRISTIAN had deescalated any perceived threat, and was standing in the universal position of surrender.

131.   When JOHN DOE 2 ordered the use of deadly force, and PHELPS and MACMILLAN shot bullets at CHRISTIAN, CHRISTIAN did not present as a credible threat of causing serious injury or death to anyone.

132.   When JOHN DOE 2 ordered the use of deadly force, and JOHN DOE 1, PHELPS and MACMILLAN shot bullets at CHRISTIAN, they violated clearly established law. See Bennett v. Murphy, 274 F.3d 133, 136 (3d Cir. 2002) (deadly force constitutionally inappropriate where decedent, who was armed, had stopped advancing toward PSP troopers and was not pointing a gun at them).

133.   When said Defendants directed the use of deadly force or used the

deadly force against CHRISTIAN, CHRISTIAN did not present as a significant physical threat to anyone.

134. When said Defendants directed the use of deadly force or used the deadly force against CHRISTIAN, CHRISTIAN was not resisting arrest.

135. Said Defendants escalated the interaction between themselves and CHRISTIAN and then used force – deadly force – that was not objectively reasonable.

136. The force used was excessive, unlawful, and used solely for the purpose of causing physical pain, injury, and/or death.

137. As a direct and proximate result of the Defendants' conduct, CHRISTIAN suffered embarrassment, humiliation, physical and psychological injury, pain and suffering, loss of enjoyment of life, and death.

138. As a direct and proximate result of the Defendants' conduct, CHRISTIAN'S ESTATE has and will incur attorneys' fees and litigation costs.

## **COUNT II**

**Plaintiff GARETH v. Defendants JOHN DOE 1,
JOHN DOE 2, PHELPS, and MACMILLAN
Fourth Amendment (Failure to Intervene)
Pursuant to 42 U.S.C. § 1983**

139. Paragraphs 1-120 are incorporated herein by reference.

140. A law enforcement officer may be held personally liable for failing to intervene in another's use of excessive force if (a) the defendant failed or refused to

31

intervene when a constitutional violation took place in his or her presence or with his or her knowledge; and (b) there was "a realistic and reasonable opportunity to intervene." Smith v. Mensinger, 293 F.3d 641, 651 (3d Cir. 2002).

141.   After JOHN DOE 1 fired bullets at CHRISTIAN and CHRISTIAN assumed the universal stance of surrender, JOHN DOE 1, JOHN DOE 2, PHELPS, and MACMILLAN, were on notice that any perceived threat had deescalated and that the firing of additional bullets would clearly be unlawful.

142.   Despite having an appreciable opportunity to do so, JOHN DOE 1, JOHN DOE 2, PHELPS, and MACMILLAN, failed to intervene to protect CHRISTIAN from being shot and killed.

143.   Instead, JOHN DOE 2 directed that CHRISTIAN be shot, and in response, PHELPS and MACMILLAN shot him.

144.   As a direct and proximate result of the Defendants' conduct, CHRISTIAN suffered embarrassment, humiliation, physical and psychological injury, pain and suffering, loss of enjoyment of life, and death.

145.   As a direct and proximate result of the Defendants' conduct, CHRISTIAN'S ESTATE has and will incur attorneys' fees and litigation costs.

## COUNT III

**Plaintiffs v. Defendants EVANCHIK, CHRISTINE, and MANCUSO**
**Conspiracy to Interfere with Civil Rights**
**Pursuant to 42 U.S.C. § 1985**

146.   Paragraphs 1-120 are incorporated herein by reference.

147.   EVANCHIK, CHRISTINE, and MANCUSO, directly participated in a conspiracy to interfere with FE and GARETH'S First Amendment Right of access to the court and their Fourteenth Amendment right to Procedural Due Process to pursue their civil rights claims.

148.   EVANCHIK furthered the conspiracy by having PSP issue a false statement, not correcting PSP's false statement, delaying an internal investigation, and attempting to force FE and GARETH to agree to a confidentiality agreement before producing MVR that he was required to produce without confidentiality pursuant to a subpoena.

149.   CHRISTINE and MANCUSO additionally furthered the conspiracy by retaliating against FE and GARETH for engaging in protected speech, covering up the fact that PSP's official statement was false, and by intentionally misleading the public during a press conference.

150.   As a direct and proximate result of EVANCHIK, CHRISTINE, and MANCUSO'S conduct, FE and GARETH suffered embarrassment, humiliation, psychological injury, pain and suffering, delayed justice, and financial loss.

151.   As a direct and proximate result of the Defendants' conduct, FE and GARETH have and will incur attorneys' fees and litigation costs.

## COUNT IV

**Plaintiffs v. Defendants CHRISTINE and MANCUSO**
**First Amendment—Retaliation**
**Pursuant to 42 U.S.C. § 1983**

152.   Paragraphs 1-120 are incorporated herein by reference.

153.   FE and GARETH engaged in constitutionally protected activities in the form of protected speech – criticizing the government.

154.   CHRISTINE and MANCUSO directly participated in violating Plaintiffs' First Amendment rights by retaliating against them for engaging in protected speech by admonishing and embarrassing FE and GARETH during a press conference for their public protests, falsely accusing them of refusing to cooperate with the criminal investigation, negatively commenting about their request to have the matter referred to the PAG, and attacked CHRISTIAN'S character.

155.   As a direct and proximate result of EVANCHIK, CHRISTINE, and MANCUSO'S conduct, FE and GARETH suffered embarrassment, humiliation, psychological harm, pain and suffering, and financial loss.

156.   As a direct and proximate result of the Defendants' conduct, FE and GARETH have and will incur attorneys' fees and litigation costs.

## COUNT V

**Plaintiffs v. Defendants PHELPS,
JOHN DOE 2, PHELPS, EVANCHIK, CHRISTINE, and MANCUSO
First, Fourth and Fourteenth Amendments—Supervisory Liability
Pursuant to 42 U.S.C. § 1983**

157.   Paragraphs 1-120 are incorporated herein by reference.

158.   A supervisor may be held liable in his/her individual capacity if s/he participated in violating a Plaintiff's rights, directed others to violate them, or had knowledge of and acquiesced in his/her subordinates' constitutional violations. See Baker v. Monroe Twp., 50 F.3d 1186, 1190-91 (3d Cir. 1995); Andrews v. City of Phila., 895 F.2d 1469, 1478 (3d Cir. 1990)).

159.   Pursuant to FED.R.CIV.P. 11(b)(3), the following factual contentions will likely have evidentiary support after a reasonable opportunity for further investigation or discovery:

a.   JOHN DOE 2 was a supervisor of PSP;

b.   JOHN DOE 2 supervised JOHN DOE 1, PHELPS, MACMILLAN, and himself, and was responsible, in whole or in part, to ensure that their conduct complied with state and federal law;

c.   JOHN DOE 2 was responsible, in whole or in part, to ensure that JOHN DOE 1, PHELPS, MACMILLAN, and his conduct complied with PSP'S policies and training;

d. Despite having an appreciable opportunity to do so, JOHN DOE 2 failed to intervene to protect CHRISTIAN from the unlawful use of force; and

e. Instead, JOHN DOE 2 permitted and used excessive force against CHRISTIAN.

160. During the incident, PHELPS held the rank of corporal and was a supervisor.

161. PHELPS supervised JOHN DOE 1, JOHN DOE 2, MACMILLAN, and himself, and was responsible, in whole or in part, to ensure that their conduct complied with state and federal law.

162. PHELPS was responsible, in whole or in part, to ensure that JOHN DOE 1, JOHN DOE 2, MACMILLAN, and his conduct complied with PSP'S policies and training.

163. Despite having an appreciable opportunity to do so, PHELPS failed to intervene to protect CHRISTIAN from the unlawful use of force.

164. Instead, PHELPS permitted and used excessive force against CHRISTIAN.

165. EVANCHIK, CHRISTINE, and MANCUSO, were supervisors and policymakers.

166. EVANCHIK continued a culture and practice of protecting PSP Troopers who engaged in wrongdoing by permitting PSP to withhold information

from the public, redact information from documents that should not be redacted, issue false statements, reject oversight recommendations, and refuse to relinquish control of investigations to independent law enforcement agencies.

167.   EVANCHIK, CHRISTINE, and MANCUSO, directly participated in a conspiracy to interfere with FE and GARETH'S civil rights.

168.   CHRISTINE and MANCUSO directly participated in violating Plaintiffs' First Amendment rights by retaliating against them for engaging in protected speech.

169.   As a direct and proximate result of JOHN DOE 2 and PHELPS' conduct, CHRISTIAN suffered embarrassment, humiliation, physical and psychological injury, pain and suffering, loss of enjoyment of life, and death.

170.   As a direct and proximate result of EVANCHIK, CHRISTINE, and MANCUSO'S conduct, FE and GARETH suffered embarrassment, humiliation, psychological injury, pain and suffering, and financial loss.

171.   As a direct and proximate result of the Defendants' conduct, FE, GARETH, and CHRISTIAN'S ESTATE have and will incur attorneys' fees and litigation costs.

## COUNT VI

**Plaintiffs v. Defendant COUNTY**
**First, Fourth and Fourteenth Amendments—Monell Liability**
**Pursuant to 42 U.S.C. § 1983**

172.   Paragraphs 1-120 are incorporated herein by reference.

173.   "Local governing bodies . . . can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690 (1978).

174.   CHRISTINE and MANCUSO were policymakers of COUNTY when they caused Plaintiffs' constitutional injuries.

175.   As such, their respective conduct is the policy of the COUNTY and the moving force that caused Plaintiffs' constitutional injuries.

176.   As a direct and proximate result of COUNTY'S conduct, FE and GARETH suffered embarrassment, humiliation, psychological harm, pain and suffering, and financial loss.

177.   As a direct and proximate result of COUNTY'S conduct, FE and GARETH have and will incur attorneys' fees and litigation costs.

## COUNT VII

### Plaintiff GARETH v. Defendants JOHN DOE 1, JOHN DOE 2, PHELPS, and MACMILLAN
### Survival (Pursuant to Pennsylvania State Law)

178.     Paragraphs 1-120 are incorporated herein by reference.

179.     Pennsylvania's Survival Act, 42 PA. CONS. STAT. § 8302 provides, "All causes of action or proceedings, real or personal, shall survive the death of the plaintiff or of the defendant, or the death of one or more joint plaintiffs or defendants."

180.     JOHN DOE 1, JOHN DOE 2, PHELPS, and MACMILLAN violated the decedent's state and federal rights causing him to suffer injury and/or death.

181.     GARETH is the Administrator of the ESTATE OF CHRISTIAN JOSEPH HALL, and thus, the Personal Representative of the decedent.

182.     GARETH, as the Personal Representative of the decedent, is asserting this survival action on behalf of the decedent against the Defendants to recover all financial damages permitted by law as a result of his injuries and/or death.

183.     As a direct and proximate result of the Defendants' conduct, CHRISTIAN suffered embarrassment, humiliation, physical and psychological injury, pain and suffering, loss of enjoyment of life, and death.

184.     As a direct and proximate result of the Defendants' conduct, CHRISTIAN'S ESTATE has and will incur attorneys' fees and litigation costs.

## COUNT VIII

### Plaintiff GARETH v. Defendants JOHN DOE 2, PHELPS, and MACMILLAN
### Wrongful Death (Pursuant to Pennsylvania State Law)

185.     Paragraphs 1-120 are incorporated herein by reference.

186.     Pennsylvania's Wrongful Death Act, 42 PA. CONS. STAT. § 8301,

provides,

(a) General rule.--An action may be brought, under procedures prescribed by general rules, to recover damages for the death of an individual caused by the wrongful act or neglect or unlawful violence or negligence of another if no recovery for the same damages claimed in the wrongful death action was obtained by the injured individual during his lifetime and any prior actions for the same injuries are consolidated with the wrongful death claim so as to avoid a duplicate recovery.

(b) Beneficiaries.--Except as provided in subsection (d), the right of action created by this section shall exist only for the benefit of the spouse, children or parents of the deceased, whether or not citizens or residents of this Commonwealth or elsewhere. The damages recovered shall be distributed to the beneficiaries in the proportion they would take the personal estate of the decedent in the case of intestacy and without liability to creditors of the deceased person under the statutes of this Commonwealth.

(c) Special damages.--In an action brought under subsection (a), the plaintiff shall be entitled to recover, in addition to other damages, damages for reasonable hospital, nursing, medical, funeral expenses and expenses of administration necessitated by reason of injuries causing death.

(d) Action by personal representative.--If no person is eligible to recover damages under subsection (b), the personal representative of the deceased may bring an action to recover damages for reasonable

hospital, nursing, medical, funeral expenses and expenses of administration necessitated by reason of injuries causing death.

187.    "Pennsylvania's Wrongful Death Act, 42 PA. CONS. STAT. § 8301, allows a spouse, children or parents of a deceased to sue another for a wrongful or neglectful act that led to the death of the deceased," and it allows, as damages, "'the value of the decedent's life to the family, as well as expenses caused to the family by reason of the death,'" Hatwood v. Hospital of the University of Pennsylvania, 55 A.3d 1229, 1235 (Pa. Super. Ct. 2012) (quoting Slaseman v. Myers, 455 A.2d 1213, 1218 (Pa. Super. Ct. 1983)).

188.    These damages include "the value of his services, including society and comfort." Id. (quoting Rettger v. UPMC Shadyside, 991 A.2d 915, 932-33 (Pa. Super. Ct. 2010)).

189.    PA.R.CIV.P. 2202 provides,

(a) Except as otherwise provided in clause (b) of this rule, an action for wrongful death shall be brought only by the personal representative of the decedent for the benefit of those persons entitled by law to recover damages for such wrongful death.

(b) If no action for wrongful death has been brought within six months after the death of the decedent, the action may be brought by the personal representative or by any person entitled by law to recover damages in such action as trustee ad litem on behalf of all persons entitled to share in the damages.

(c) While an action is pending it shall operate as a bar against the bringing of any other action for such wrongful death.

190.     FE and GARETH are CHRISTIAN'S parents and the sole heirs to his Estate.

191.     As a direct and proximate cause of JOHN DOE 2, PHELPS, and MACMILLAN'S conduct, which caused CHRISTIAN'S wrongful death, FE and GARETH suffered a financial loss associated in large part with lost services, society, guidance, companionship, and comfort.

192.     GARETH is the Administrator of the ESTATE OF CHRISTIAN JOSEPH HALL, and thus, the Personal Representative of the decedent.

193.     GARETH, as the Personal Representative of the decedent, is asserting this wrongful death claim on behalf of FE and himself, to recover all financial losses discussed herein permitted by law.

**WHEREFORE**, Plaintiffs respectfully request that judgment be entered in their favor as follows:

A.     **Declaratory Judgment:** Providing that the Defendants' individual and collective conduct violated CHRISTIAN, FE, and GARETH'S Commonwealth and Federal rights;

B.     **Compensatory Damages:** Including, but not limited to, the monetary value associated with the following: violations of legal rights, emotional distress, emotional injury, embarrassment, loss of reputation, loss of support, physical injury, pain and suffering, loss of enjoyment of life (hedonic damages), and death;

C.      **Punitive damages** as permitted by law;

D.      **Equitable Relief:** An admission of the allegations stated in the Complaint, in writing, and an oral and written apology for same, in person, from the Defendants;

E.      **Attorney's Fees and Costs**; and

F.      **Discretionary Damages and Relief:** Such other financial or equitable relief that the Court deems reasonable and just.

### **Jury Trial Demand**

Plaintiffs respectfully request a trial by jury on all claims/issues in this matter that may be tried to a jury.

**Respectfully Submitted,**

s/ *Devon M. Jacob*                                    **Date: March 30, 2022**
**DEVON M. JACOB, ESQUIRE**
PA Bar Number: 89182
**JACOB LITIGATION, INC.**
P.O. Box 837, Mechanicsburg, Pa. 17055-0837
717.796.7733 | djacob@jacoblitigation.com
(Plaintiffs' Counsel)

s/ *Benjamin L. Crump*                              **Date: March 30, 2022**
**BENJAMIN L. CRUMP, ESQUIRE**
FL Bar Number: 72583
**BEN CRUMP LAW, PLLC**
122 S. Calhoun Street, Tallahassee, Florida 32301
(850) 224-2023 | court@bencrump.com
(Plaintiffs' Counsel) (Pro Hac Vice to be Filed)